**SKYBOLT AEROMOTIVE**
**CORPORATION, a Florida Corporation**

      **Plaintiff,**

**v.**                                    **Case No: 5:16-cv-616-Oc-PRL**

**MILSPEC PRODUCTS, INC. and**
**JEREMY SUMMERS**

      **Defendants.**

_____

## ORDER

In this consent case, Plaintiff seeks a preliminary injunction to enjoin Defendants MilSpec Products, Inc. and Jeremy Summers, who is MilSpec's president, from selling, as Federal Aviation Administration approved, fasteners and other products used on airplanes.   (Docs. 32, 32-1–32-15, 33, 34).   Defendants, of course, oppose the motion.   (Docs. 38, 39, 40, 41).   Upon a review of these filings, and after a hearing on Plaintiff's motion (Docs. 35, 47), the Court asked the parties to brief the applicability of the primary jurisdiction doctrine (Doc. 49), as it appears that the Federal Aviation Administration has regulatory authority over the issues raised.   They have now done so (Docs. 57, 59), and for the reasons that follow, this case is referred to the Federal Aviation Administration under the primary jurisdiction doctrine for initial consideration of the issues before the Court.

# I.     BACKGROUND[1]

Plaintiff and MilSpec compete in the "aerospace fastener industry wherein both parties sell quarter turn fasteners, panel fasteners, cowling fasteners and captive fasteners which are installed on general aviation airframes, corporate jet aircraft and commercial airplanes."   (Doc. 32 at p.2). According to Plaintiff, both of the companies' fasteners "must meet certain performance standards prescribed in technical standard order (TSO) C-148 ("TSO-C148") in order to be sold and installed on aircraft" and "in order to advertise or promote the fact that one has TSO-C148 approval, one must submit a TSO application to the F[ederal] A[viation] A[dministration] with drawings, fastener performance requirements and limitations, TSO Qualification test reports, lot numbers of qualification parts, raw material heat number or certification numbers and material composition of the qualification parts."   (Doc. 32 at p.2).

TSO-C148 approval is, as noted above, obtained from the Federal Aviation Administration (the "FAA").   *See infra* section III.A.   At the heart of the issues before the Court are Plaintiff's allegation that MilSpec falsely advertises TSO-C148 production approval for a significant number of the fasteners it sells.[2]   (Docs. 1 at ¶32; 32 at p.11).

---

[1] For purposes of this Order, the Court will address only facts that are relevant to the primary jurisdiction doctrine and its application to this case, but numerous other claims and counter-claims are at issue.  (Docs. 1, 15).  As noted *supra*, in addition to Plaintiff's motion for a preliminary injunction, also before the Court is Plaintiff's motion for sanctions (Docs. 55, 56), Defendants' response (Doc. 61, 62, 63, 64, 65) to that motion, and Plaintiff's reply (Doc. 69).  The sanctions motion alleges that Defendants submitted fraudulent documents to the Court.  As the filings on sanctions address numerous documents that are relevant to the applicability of the primary jurisdiction doctrine, the Court will utilize here these arguments and filings.

[2] Although Plaintiff alleges that MilSpec has made other false advertisements in the past, MilSpec's advertisements that it has TSO-C148 approval for its fasteners were the only ongoing advertisements at issue when Plaintiff filed its motion for entry of a preliminary injunction.  (*See* Docs. 32 at pp.1–2; 38 at pp.1–2).

Specifically, Plaintiff alleges that MilSpec has TSO-C148 approval for these (and only these) fasteners: C-SPEC 2600, 2700, and 4002 parts (granted in a FAA letter dated September 9, 2003) and C-SPEC Isolator Platemount Assembly parts (granted in a FAA letter dated April 5, 2016).[3]  (Docs. 1 at ¶32; 32 at pp.11–12; 32-1; 32-5).  Indeed, the parties agree that MilSpec obtained TSO-C148 approval on September 9, 2003 for its C-SPEC 2600, 2700, and 4002 parts and approval on April 5, 2016 for its C-SPEC Isolator Platemount Assembly parts as both parties are in possession of documents purportedly from the FAA that the parties (mostly) agree are authentic.[4]  And thus, among other parts, Plaintiff concludes that MilSpec falsely advertises TSO-C148 approval for these fasteners: A-SPEC parts, Z-SPEC parts, and C-SPEC 2800, 2000, and 4000 parts.  (Doc. 32-15 at p.4).

Plaintiff bases these allegations, in part, on two Freedom of Information Act ("FOIA") requests it placed with the FAA and to which the FAA has responded.  (Doc. 1 at ¶¶33–34; 1-1 at p.66; 32 at ¶¶4–9; 32-5).  In short, Plaintiff requested from the FAA any and all correspondences with MilSpec from September 9, 2003 to March 2, 2017.  (Doc. 32 at ¶¶4–9).  In response to these FOIA requests, the FAA provided Plaintiff with documents that fail to show that MilSpec

---

[3] At the time the FAA granted TSO-C148 approval for the C-SPEC 2600, 2700, and 4002 parts in 2003, those parts where known as C-LOCK parts.  (Docs. 32 at ¶5; 55-10).  And though the current term that MilSpec uses for these parts is "SPEC" (as in A-SPEC, C-SPEC, and Z-SPEC), many of the documents at issue here, even recent documents, use the old term "LOCK" (as in A-LOCK, C-LOCK, and Z-LOCK).

[4] There are apparently two versions of this September 9, 2003 FAA approval letter in the record before the Court.  (*Compare* Doc. 55-2 *with* Doc. 55-10).  And Plaintiff does dispute a very narrow portion of one of these versions.  Namely, Plaintiff contends that the version of the letter it received from the FAA via its FOIA request is the correct version of the September 9, 2003 TSO-C148 approval letter and that the letter does not grant MilSpec TSC-C148 approval for its "MS-O ( ) S Plush Flush—Extended Depth" parts.  (Doc. 55 at p.7).  Another version of the September 9, 2003 TSO-C148 approval letter that Defendants provided the Court does purport to grant approval for those parts.  (Doc. 55-2).  According to Plaintiff, Summers fraudulently inserted the "MS-O ( ) S Plush Flush—Extended Depth" parts approval in the September 9, 2003 letter.  Summers has now admitted that he did alter the September 9, 2003 letter by adding in the "MS-O ( ) S Plush Flush—Extended Depth" parts and he admits that he submitted that altered document to the FAA and to this Court.  (Docs. 61 at ¶¶18, pp.7–8; 62 at ¶13).

has the TSO-C148 approvals it says it has (with the exception, as noted, of the C-SPEC 2600, 2700, and 4002 parts and the C-SPEC Isolator Platemount Assembly parts).   (Doc. 32-5).

As discovery has progressed, however, MilSpec and Summers have submitted here various alleged FAA documents to show the TSO-C148 approvals at issue.   (*See, e.g.*, Doc. 39).   But Plaintiff challenges these documents: unlike the September 9, 2003 and April 5, 2016 FAA letters that the parties agree grant, respectively, MilSpec TSO-C148 approval of its C-SPEC 2600, 2700, and 4002 parts (with the exception of the "MS-O ( ) S Plush Flush—Extended Depth" parts, which is in dispute) and its C-SPEC Isolator Platemount Assembly parts, Plaintiff disputes the veracity of most of these documents.   Indeed, as previously noted, Plaintiff asserts that Defendants have implemented a complex fraudulent scheme using numerous forged or otherwise fraudulent documents to deceive the FAA, this Court, and Plaintiff into believing that MilSpec has TSO-C148 approvals that it does not have.   (Doc. 49 at p.2).   The Court will now identify these purportedly fraudulent documents, which are relevant to the primary jurisdiction doctrine.[5]

Defendants have submitted a purported FAA document dated December 23, 2003 or 2008 (the parties disagree what year the document is dated).   (Docs. 38 at ¶12; 39 at ¶¶17(a), 18–20 and at p.7).   This document purports to be a "response to [Summer's] letter, dated September 10, 2003, and subsequent letter, dated November 4, 2003, for the Federal Aviation Administration to grant requested authorization to produce new items on structural panel fasteners approved under TSO-C148."   (Doc. 39 at p.7).   The letter further purports to approve MilSpec's "Quality Assurance Manual, Revision '002,' dated August 26, 2003" and states that "the articles are approved for production at the Sorrento, FL facility."   (Doc. 39 at. p.7).   But the letter does not

---

[5] Undoubtedly, there are many documents before the Court that are either mentioned in passing or that are not discussed here—this analysis is restricted to the evidence directly relevant to whether this case should be referred to the FAA.

identify any specific parts. Plaintiff asserts that Summers created the document by cutting and pasting a document that Defendants previously produced to Plaintiff (around seven years ago) in a prior litigation. (Doc. 55 at ¶29). Summers did contend—at one point in time—that this letter was a "true and accurate correspondence from the FAA to MilSpec, which w[as] sent to MilSpec as part of the FAA TSO-C148 production approval process, confirming FAA TSO-C148 production approval." (Doc. 39 at ¶¶17(a), 18, 19). But now he avers that he does not know "the origin" of this letter. (Doc. 62 at ¶16).

Defendants have also submitted an alleged FAA document dated December 23, 2009.[6] (Doc. 39 at pp. 8–9). This document purports to grant MilSpec TSO-C148 approval for numerous A-LOCK, Z-LOCK, and C-LOCK parts. Plaintiff has called the veracity of this document into question on (at least) six separate bases:

1) its experts' testimony that analyzes the purported signature of Eugene Evans (Evans is apparently an Associate Manager-Airframe of the Atlanta Aircraft Certification Office) and concludes that the signature was forged (Docs. 42, 42-1, 42-2);

2) the lack of technical data in the letter (this argument is based on juxtaposing this letter with other similar letters—letters which Plaintiff contends are authentic FAA letters that which refer to technical data in approving other parts under TSO-C148) (Doc. 55 at pp.14–15);

3) Summers' statement that he altered the document to reflect approval for production at his "Sorrento" location (Doc. 62 at ¶16);

4) the concept that at the time of the letter dated 2009, MilSpec did not yet use the terms "C-SPEC, A-SPEC, and Z-SPEC," thus the drawings lists that use those

_____

[6] There are two versions of this document. The only difference between the two is the production facility location: one document lists the approved production location as the "Sorrento, FL facility" (Doc. 55-1) and the other lists the approved production location as the "Leesburg, FL facility" (Doc. 55-7). According to Plaintiff, both versions were created by Summers in Microsoft® Word and then converted into PDF format. (Doc. 55 at ¶19). Allegedly, the "Sorrento" version was created on March 5, 2017 and the "Leesburg" version was created on March 28, 2017. (Doc. 55 at ¶22; ¶ 25) ("It is Plaintiff's position and the evidence supports the fact that SUMMERS actually created the entire December 23, 2009 letter as opposed to only changing the location."). Summers, for his part, asserts that the "Leesburg" version is the original and that he altered the document by replacing the word "Leesburg" with the word "Sorrento." (Docs. 61 at p.9; 62 at ¶16).

terms and that purport to support this December 23, 2009 TSO-C148 approval are suspect (Doc. 55 at ¶¶35–36);[7]

5) CAD drawings that Plaintiff alleges were created after 1999 and modified in 2017 and that MilSpec has submitted as proof of obtaining TSO-C148 approval from the FAA (Doc. 55 at p.15);[8] and

6) metadata that allegedly shows Summers created the December 23, 2009 document in a Microsoft® Word program in March of this year (Docs. 42; 42-3; 56-2 at ¶¶5–12).

(*See generally* Docs. 32, 33, 34, 42, 55).[9]

Defendants have also submitted two documents that Plaintiff does not *directly* dispute as true FAA documents.[10]  (Doc. 39 at pp.13–15, 16–18).  First, Defendants have submitted an alleged FAA letter dated February 27, 2017, which is an apparent request from the FAA to Summers asking him to provide the FAA "with a copy of [Milspec's] complete TSO application and their FAA TSOAs for project number SP12050AT:"

An internal FAA audit of the FAA's Certification Project Notification database, Regulatory Guidance Library, and records archive revealed that the TSO applications and data your company submitted for the approval of the TSO-C148 fasteners (listed in Table 1, below) under FAA project number SP12050AT are

---

[7] To clarify, Defendants submitted to Plaintiff and the Court a "Drawing Master List" that purports to have received TSO minor change acceptances from the Atlanta Aircraft Certification Office on April 4, 2017.  (Doc. 39 at pp.66–69).  The Drawing Master Lists states the words "FAA project number SP12050AT" and includes apparent drawings for certain C-LOCK, Z-SPEC, and A-SPEC parts (and other parts).  (Doc. 39 at pp. 66–67).

[8] Although Plaintiff's briefing and the affidavit of its expert Richard Connor assert that these drawings were created after 1999 (Docs. 55 at p.15; 56-2 at ¶¶13–14), it is apparent that Plaintiff meant to assert that the drawings were created after 2009—i.e., created after the supposed December 23, 2009 approval.  (*See* Doc. 61 at p.8) ("As to the CAD drawings, Mr. Summers explains that it is MilSpec's company policy to save over earlier versions of the drawings once they are revised. Thus, the electronic CAD files reflect modified dates after 2009.").  Plaintiff asserts that Defendants have violated 14 C.F.R. § 21.137(k) by modifying the CAD drawings.  (Doc. 69 at ¶21); 14 C.F.R. § 21.137(k) ("A production approval holder must retain these records for at least 5 years for the products and articles manufactured under the approval and at least 10 years for critical components identified under § 45.15(c) of this chapter.").

[9] Plaintiff further alleges that MilSpec falsely advertises TSO-C148 approval for over four-hundred parts that are not included in the September 9, 2003, December 23, 2009, and April 5, 2016 FAA letters.  (Docs. 49 at n.1; 57 at n.3).  As of Plaintiff's latest filing, it appears that MilSpec has taken down any reference to TSO-C148 from its website.  (Doc. 69 at n.2).

[10] That is, Plaintiff does not argue that these documents are forgeries.  Defendants have also submitted numerous email correspondence between Summers and FAA officials that date from March 28, 2017 to April 5, 2017.  (Doc. 39).  Plaintiff does not allege that these emails are forgeries.

> missing from our records. MilSpec Products submitted those TSO applications and data in accordance with 14 CFR 21.603(a) on or about September 10, 2009, and November 4, 2009. The Atlanta Aircraft Certification Office (ACO) issued the TSO Approvals (TSOA) on or about December 3, 2009, and December 21, 2009.

(Doc. 39 at pp.13–15). The letter expounds, "To rectify this situation, we request your assistance in providing us with a copy of your complete TSO applications and their FAA TSOAs for project number SP12050AT." (Doc. 39 at p.13). This document contains a table titled "TSO C148 fasteners authorized through FAA project number SP12050AT" and that table includes numerous C-LOCK, Z-LOCK, and A-LOCK parts that are at issue here. (Doc. 39 at pp.13–15).

Second, Defendants have submitted an alleged FAA letter dated March 30, 2017. This letter appears to be intended to correct a "TSOA letter, dated December 23, 2009, which incorrectly referenced the production facility as Leesburg, FL, instead of Sorrento, FL." (Doc. 39 at p.16). The letter purports to also be a "response to [Summer's] letter, dated September 10, 2009, and subsequent letter, dated November 4, 2009, for the Federal Aviation Administration to grant requested authorization to produce new items on structural panel fasteners approved under TSO-Cl48" and states that "[w]e find your statement of conformance and MilSpec, Inc. Quality Assurance Manual, Revision '003,' dated March 03, 2011, acceptable and the articles below are approved for production at the Sorrento, FL facility." (Doc. 39 at p.16). Then the letter goes on to list numerous C-LOCK, Z-LOCK, and A-LOCK parts that are at issue here. (Doc. 39 at pp.16–18).

Plaintiff does not directly challenge the validity of the February 27, 2017 and March 30, 2017 letters but, instead, implies that Defendants improperly obtained these letters from the FAA by their duplicity, which includes the forged December 23, 2009 letter and other malfeasance. (*See* Doc. 55 at p.16) ("What Defendants provided to the FAA were falsified and fabricated documents that were created and modified after 2009 in order to prove up an approval that was

allegedly submitted in 2009."); (Doc. 55 at p.18) ("Defendants fabricated the December 23, 2009 document and the December 23, 2003 document; altered the September 9, 2003 document; and modified all of its drawings and MDL's before providing them to the FAA, Plaintiff and this Court claiming that such documents were originally sent to the FAA in 2009 when in fact they were not."). In sum, Plaintiff—at least implicitly—challenges whether the FAA properly granted MilSpec TSO-C148 approval in the alleged FAA letter dated March 30, 2017.

## II.    LEGAL STANDARD

"Under the primary jurisdiction doctrine, a court of competent jurisdiction may stay an action pending resolution of an issue that falls within the special competence of an administrative agency." *Beach TV Cable Co. v. Comcast of Florida/Georgia, LLC*, 808 F.3d 1284, 1288 (11th Cir. 2015). Even when a "court is authorized to adjudicate the claim before it, the primary jurisdiction doctrine 'comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.'" *Smith v. GTE Corp.*, 236 F.3d 1292, 1312 n.3 (11th Cir. 2001) (quoting *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)).

"The primary jurisdiction doctrine is a flexible tool that is designed to allocate efficiently fact finding between the federal courts and administrative agencies." *Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.*, 148 F.3d 1231, 1259 (11th Cir. 1998) (J. Roney, dissenting). Put differently, "[t]he primary jurisdiction doctrine is thus no more than recognition of the fact that the compelling necessity for regulatory uniformity and consistency, coupled with the almost infinite variety of administrative rules and regulations which affect or may affect a particular dispute, initially require administrative rather than judicial fact-finding and rule-applying expertise."

*Taylor Cty. Sand Co. v. Seaboard Coast Line R. Co.*, 446 F.2d 853, 854 (5th Cir. 1971).[11]

The doctrine of primary jurisdiction may justify staying a case "which raise issues of fact not within the conventional experience of judges or which require the exercise of administrative discretion." *Sunbird Air Serv., Inc. v. Beech Aircraft Corp.*, 789 F. Supp. 360, 363 (D. Kan. 1992); *see Far East Conference v. United States*, 342 U.S. 570, 574–75 (1952). "The doctrine functions not to determine whether the court or agency will finally decide an issue; rather it serves to delay the judicial decision until the court can take advantage of the agency's expertise." *Id.* The two main justifications for invoking the primary jurisdiction doctrine are the need for agency expertise and the need for uniform interpretation of a statute or regulation. *Boyes v. Shell Oil Prod. Co.*, 199 F.3d 1260, 1265 (11th Cir. 2000).

The doctrine is inapplicable when the Court is faced with a question of law. *Georgia Power Co. v. Baker*, 591 F. Supp. 1569, 1573 (M.D. Ga. 1984) (citing *Great Northern Railway Co. v. Merchants Elevator Co.*, 259 U.S. 285, 294 (1922)). But "[t]he doctrine recognizes that if 'the inquiry is one of fact and of discretion in technical matters,' then resolution of the inquiry by the court 'is tantamount to engaging in judicial guesswork.'" *Gamble v. PinnOak Res., LLC*, 511 F. Supp. 2d 1111, 1126 (N.D. Ala. 2007) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 66, 68 (1956)) (citations omitted).

"[I]n determining whether to exercise its discretion [in invoking the primary jurisdiction doctrine], the district court must first be satisfied that the particular agency has jurisdiction over the issue presented." *Id.* at 1127. If it does, the court will then "consider four factors when applying the doctrine of primary jurisdiction: (1) the need to resolve an issue that (2) has been

---

[11] Decisions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration."[12] *Herazo v. Whole Foods Mkt., Inc.*, No. 14-61909-CIV, 2015 WL 4514510, at *5 (S.D. Fla. July 24, 2015). Finally, where "the doctrine of primary jurisdiction applies, the court has discretion either to stay the case and retain jurisdiction or to dismiss the case without prejudice if the Parties would not be unfairly disadvantaged." *Greenfield v. Yucatan Foods, L.P.*, 18 F. Supp. 3d 1371, 1377 (S.D. Fla. 2014).

## III.    DISCUSSION

For the reasons that follow, this case should be referred to the FAA for consideration of the allegations contained in Plaintiff's Complaint (Doc. 1), its motions (Docs. 32, 55), and its other filings (Docs. 33, 34, 42, 56, 69). In short, the factual issues before the Court are within the FAA's jurisdiction and regulatory authority, require the FAA's expertise, and require regulatory uniformity. Further, given the numerous other claims and counter-claims at issue, this case is stayed pending the outcome of the FAA's decision.

### A.    The FAA has the jurisdiction and the regulatory authority to address TSO-C148 approval

The parties do not dispute that the FAA can properly address MilSpec's purported TSO-C148 approval or lack thereof. (Docs. 57 at pp.1–2; Doc. 59). Without a doubt, through Congress, the FAA has expansive authority to "promote safe flight of civil aircraft in air commerce

---

[12] Put another way, "[u]nder the doctrine, the following four factors are relevant to a court's determination of whether to defer to an agency's primary jurisdiction: '(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made.'" *Functional Pathways of Tennessee, LLC v. Cross*, No. 15-CV-616000-WPD, 2016 WL 6902363, at *3 (S.D. Fla. Feb. 23, 2016) (quoting *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222 (2d Cir. 1995)).

by prescribing," among other things, "minimum standards required in the interest of safety for appliances and for the design, material, construction, quality of work, and performance of aircraft." 49 U.S.C. § 44701(a)(1). Under this congressional power, the FAA has issued regulations that allow it to set "minimum performance standard for specified articles used on civil aircraft." 14 C.F.R. § 21.601(b)(1); *see* §§ 21.601–21.621.

### 1. Technical Standing Orders

These minimum performance standards are known as Technical Standard Order or TSOs. 14 C.F.R. § 21.601(a)–(b). If a specified article meets a TSO, the FAA will issue a "TSO authorization," which "is an FAA design and production approval issued to the manufacturer of an article that has been found to meet a specific TSO." 14 C.F.R. § 21.601(b)(2).[13] "A TSO authorization or letter of TSO design approval is effective until surrendered, withdrawn, or otherwise terminated by the FAA." 14 C.F.R. § 21.601(a).

In order to obtain a letter of TSO design approval, the applicant must "apply to the appropriate aircraft certification office in the form and manner prescribed by the FAA" and provide the following documents: "(1) A statement of conformance certifying that the applicant has met the requirements of this subpart and that the article concerned meets the applicable TSO that is effective on the date of application for that article" and "(2) One copy of the technical data required

---

[13] *See also* § 21.611 ("If the FAA finds that the applicant complies with the requirements of this subchapter, the FAA issues a TSO authorization to the applicant (including all TSO deviations granted to the applicant)."); § 21.1(a), (b)(4) (noting that the Code of Federal Regulations Title 14, Chapter I, Part 21, prescribes the procedural requirements for issuing and changing design, production, and airworthiness approvals, including TSO authorizations).

in the applicable TSO."[14]  14 C.F.R. § 21.603(a)(1–2).  "If the application is deficient, the applicant must, when requested by the FAA, provide any additional information necessary to show compliance with this part. If the applicant fails to provide the additional information within 30 days after the FAA's request, the FAA denies the application and notifies the applicant."  14 C.F.R. § 21.603(c).  In the alternative, the applicant may also apply for approval of a deviation "from any performance standard of a TSO [and] must show that factors or design features providing an equivalent level of safety compensate for the standards from which a deviation is requested."  14 C.F.R. § 21.618(a); § 21.618(b).

"After the issuance of a TSO authorization—(a) Each change to the quality system is subject to review by the FAA; and (b) The holder of the TSO authorization must immediately notify the FAA, in writing, of any change that may affect the inspection, conformity, or airworthiness of its article."  14 C.F.R. § 21.620.  Also, a manufacturer who holds a TSO

---

[14] Though the parties do not provide the Court with a copy of TSO-C148, the Court has found a version dated September 26, 1997 from the FAA website, which appears to be the current version.  *See* http://rgl.faa.gov/Regulatory_and_Guidance_Library/rgTSO.nsf/0/ad05ba590f484d1a86256dac0068f6a6/ $FILE/C148.pdf.  According to this version, TSO-C148 "prescribes the minimum performance standards that aircraft mechanical fasteners must meet to be identified with the applicable TSO marking." TECHNICAL STANDARD ORDER, *TSO-C148, Aircraft Mechanical Fasteners*, at 1 (September 26, 1997); *see also* (Doc. 1-1 at pp.59–62) (an undated "Proposed" version of TSO-C148).  An application for TSO-C148 approval shall include:

> (1) Part drawing and applicable part specification(s) necessary to define the design, minimum performance, and metallurgy for each fastener part number. (2) Manufacturer's TSO qualification test report in accordance with the test procedures specified in Appendix 1. (3) Inspection lot number(s) of qualification parts. (4) Raw material heat (lot) or certification number for each qualification lot(s) of fasteners.

*Id.* at 5(a).  TSO-C148 includes a single appendix, which includes "Aircraft Mechanical Fastener Property Test Requirements."  *Id.* at Appendix 1.  This appendix includes a Table that "specifies fastener property test requirements for each fastener type, as defined on the manufacturers drawing(s) and/or specification(s). The specific material, dimension(s), and heat treat form the basis of the fastener's design; the specific values for tensile, shear, torque, fatigue, and preload form the basis of the fastener's 'minimum performance;' and metallurgy and discontinuity are the fastener's metallurgical properties."  *Id.* at Appendix 1.

authorization may make minor design changes without FAA approval, but "[b]efore making a major change," which is defined as "[a]ny design change by the manufacturer extensive enough to require a substantially complete investigation to determine compliance with a TSO is a major change," "the manufacturer must assign a new type or model designation to the article and apply for an authorization under 14 C.F.R. § 21.603." 14 C.F.R. § 21.619(a–b).

To ensure compliance, an applicant "must allow the FAA to inspect its quality system, facilities, technical data, and any manufactured articles and witness any tests, including any inspections or tests at a supplier facility." 14 C.F.R. § 21.610.[15] Further, "[e]ach applicant for or holder of a TSO authorization must provide the FAA with a document—(1) Describing how its organization will ensure compliance with the provisions of this subpart; (2) Describing assigned responsibilities, delegated authorities, and the functional relationship of those responsible for quality to management and other organizational components; and (3) Identifying an accountable manager." 14 C.F.R. § 21.605(a)(1–3). And an applicant's designated "accountable manager" "must be responsible within the applicant's or production approval holder's organization for, and have authority over, all production operations conducted under th[e approved] part;" "must confirm that the procedures described in the quality manual required by [14 C.F.R.] § 21.608 are in place and that the production approval holder satisfies the requirements of the applicable regulations of subchapter C, Aircraft;" and "must serve as the primary contact with the FAA." 14

---

[15] "Each applicant for or holder of a production certificate must establish and describe in writing a quality system that ensures that each product and article conforms to its approved design and is in a condition for safe operation." 14 C.F.R. § 21.137; § 21.607; *see also* § 21.608 (noting that each applicant must provide the FAA with a quality manual "describing its quality system to the FAA for approval," which is "in the English language and retrievable in a form acceptable to the FAA"). As stated *supra* in note 8, Plaintiff asserts that Defendants have violated 14 C.F.R. § 21.137(k) by modifying CAD drawings. (Doc. 69 at ¶21; 14 C.F.R. § 21.137(k) ("A production approval holder must retain these records for at least 5 years for the products and articles manufactured under the approval and at least 10 years for critical components identified under § 45.15(c) of this chapter.").

C.F.R. § 21.605(b). Once TSO authorization is obtained, the holder then has numerous responsibilities.[16]

With all this said, it is clear that "the role of the FAA in granting TSO authorizations involves considerable latitude for policy judgment and discretion:"

> The role of the FAA in issuing TSO authorizations involves a balancing of a myriad of factors. The administrator must first evaluate the applicant's quality control system; he must analyze the inspection and test procedures used to ensure that each article conforms to the type design, and is in a condition for safe operation; and he must also inspect all subsidiary manufacturers who are involved in the assembly of the product, and for whom the prime manufacturer is responsible. When the administrator has completed this preliminary analysis, he may then either approve the application or request additional information to assist him in his determination. The administrator, if he so decides, may personally inspect the articles manufactured, the manufacturing facilities, the quality inspections and tests, and the technical data files.

*Takacs v. Jump Shack, Inc.*, 546 F. Supp. 76, 78, 79 (N.D. Ohio 1982) (page number omitted).

### 2. *FAA Enforcement Authority Applicable to TSOs*

The FAA's regulatory authority over TSO applications does not end with grants and denials—it also includes enforcement powers. For instance, under 14 C.F.R. § 21.2(a), applicants are prohibited from making false applications to the FAA for approval, which, under

---

[16] 14 C.F.R. § 616 (cataloging these duties to include the following: "(a) Amend the document required by § 21.605 as necessary to reflect changes in the organization and provide these amendments to the FAA; (b) Maintain a quality system in compliance with the data and procedures approved for the TSO authorization; (c) Ensure that each manufactured article conforms to its approved design, is in a condition for safe operation, and meets the applicable TSO; (d) Mark the TSO article for which an approval has been issued. Marking must be in accordance with part 45 of this chapter, including any critical parts; (e) Identify any portion of the TSO article (e.g., sub-assemblies, component parts, or replacement articles) that leave the manufacturer's facility as FAA approved with the manufacturer's part number and name, trademark, symbol, or other FAA approved manufacturer's identification; (f) Have access to design data necessary to determine conformity and airworthiness for each article produced under the TSO authorization. The manufacturer must retain this data until it no longer manufactures the article. At that time, copies of the data must be sent to the FAA; (g) Retain its TSO authorization and make it available to the FAA upon request; and (h) Make available to the FAA information regarding all delegation of authority to suppliers").

§§ 21.1(a),(b)(4), includes "TSO authorization, letter of TSO design approval, or other approved design:"

> A person may not make or cause to be made—(1) Any fraudulent, intentionally false, or misleading statement on any application for . . . approval under this part; (2) Any fraudulent, intentionally false, or misleading statement in any record or report that is kept, made, or used to show compliance with any requirement of this part; (3) Any reproduction for a fraudulent purpose of any . . . approval issued under this part[; or] (4) Any alteration of any . . . approval issued under this part.

If a person performs one of those prohibited acts or acts, the act "is a basis for—(1) Denying issuance of any . . . approval under this part; and (2) Suspending or revoking any . . . approval issued under this part and held by that person."   14 C.F.R. § 21.2(b)(1–2).

What is more, it is undisputed that the FAA has an expansive mechanism for addressing and remedying violations of the Federal Aviation Act and its regulations thereunder.   When the FAA determines, for example, that a person "has engaged, or is about to engage, in any act or practice constituting a violation of the Federal Aviation Act of 1958, or any regulation or order issued under it for which the FAA exercises enforcement responsibility, . . . the [FAA's] Chief Counsel, [or other proper FAA authority] . . . , may request the United States Attorney General, or the delegate of the Attorney General, to bring an action in the appropriate United States District Court for such relief as is necessary or appropriate, *including mandatory or prohibitive injunctive relief*."   14 C.F.R. § 13.25(a) (emphasis added).   And as Plaintiff itself states, "the FAA may choose to impose civil penalties on Defendants, as well as enter orders of compliance, cease and desist orders, injunctions and provide for criminal penalties of fines and imprisonment."   (Doc. 57 at p. 9) (footnotes omitted) (citing 14 C.F.R. §§ 13.14, 13.15, 13.16, 13.20, 13.23, 13.25). Therefore the FAA is capable of obtaining injunctive relief (and other relief) against persons and entities that violate FAA regulations.

Lastly, the FAA has contemplated the scenario where, as here, a private citizen suspects that violations of FAA regulations have occurred. The FAA expects private citizens, like Plaintiff and its administrators, to report known and suspected violations of its regulations through a remedial administrative process: "Any person who knows of a violation of the Federal Aviation Act of 1958 . . . or any rule, regulation, or order issued thereunder, should report it to appropriate personnel of any FAA regional or district office."[17]    14 C.F.R. § 13.1(a).

Indeed, the public may report suspected unapproved parts, even anonymously, through the FAA's Suspected Unapproved Parts Program (SUP Program). *See* FAA ORDER 8120.16A, *Suspected Unapproved Parts Program*, at 3-1 (June 3, 2016) (*available at* https://www.faa.gov/documentLibrary/media/Order/FAA_Order_8120_16A.pdf).    [18]    As described, the purpose of the SUP program is to ensure the safety of the aviation community through "aggressive and consistent investigative and corrective actions."[19]   The FAA "aims" to prevent unapproved parts that have entered the market from being installed and, if they do enter the market, purge them.[20]   Further, the SUP program explicitly covers "[p]arts offered as having been produced under an FAA production approval, where no such FAA approval was issued." *Id.* at Appendix D, v.(5).

---

[17] Similarly, as discussed *infra* Part IV, the FAA has provided for a "Formal Complaint" process in which "[a]ny person may file a complaint with the Administrator with respect to anything done or omitted to be done by any person in contravention of any provision of any Act or of any regulation or order issued under it, as to matters within the jurisdiction of the Administrator." 14 C.F.R. § 13.5(a).
[18] Order 8120.16A "describes responsibilities, policies and procedures for coordinating, investigating, and processing Federal Aviation Administration (FAA) suspected unapproved parts (SUP) reports." *Id.* at 1-1.
[19] "The objective of the SUP Program is to mitigate the potential safety threat to the aviation community posed by 'unapproved parts'" and the program "seeks to prevent unapproved parts from entering the system by aggressive and consistent investigative and corrective actions when detected." *Id.* at 2-1.
[20] "If unapproved parts have already entered inventories, the program aims to prevent such parts from being installed on aircraft and are then purged from the system as soon as practicable." *Id.* at 2-1.

## B. The FAA should address this case

1.      The parties agree that factual issues are before the Court.  They disagree, however, on what type of factual issues are at stake.

According to Plaintiff, who would prefer that this case remain here, mere historical issues are before the Court.  *See In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Practices Litig.*, No. 12-MD-2320-PB, 2013 WL 1124081, at *7 (D.N.H. Mar. 18, 2013) (noting that the type of "historical fact finding [at issue wa]s well within the competence of a court to conduct" and declining to refer the case under the primary jurisdiction doctrine).  Plaintiff asserts that this case "is not about whether or not FAA approval was properly granted [to Defendants] or not—[the issue] is simply whether the approval(s) existed at the time Defendants were advertising to the public that they had FAA approval."[21]   (Doc. 57 at p.9).   In other words, Plaintiff says that the issues before the Court are merely the historical questions of whether MilSpec has (or had) the approvals that it says it does have (or did have) and whether Defendants have engaged in litigation misconduct by committing fraud on the Court.   Plaintiff contends that these factual issues are well within the Court's conventional competence.[22]

In contrast, Defendants contend, "the issues the Court should refer to the FAA for determination are: should MilSpec have TSO-C148 approval for its fasteners and products produced for aircraft use and, if so, when did the FAA grant such approval."   (Doc. 59 at p.9).

---

[21] (Doc. 57 at p.2) ("[T]his case is not about the technicalities of TSO-C148 approval; <u>it is about whether or not MILSPEC and SUMMERS falsified, fabricated and forged documents</u> to support 'approval' of Defendants' previously advertised products.") (emphasis in the original).

[22] (Doc. 57 at p.6) ("[I]t is Plaintiff's position that although the primary jurisdiction doctrine might be relevant to some of the issues; it should not be invoked because this Court, with the assistance of experts, can and should determine whether or not Defendants have committed litigation misconduct, which will in turn determine whether or not Defendants have the approvals they claim they have—and that is the heart of Plaintiff's false and misleading advertising claims.").

Put differently, Defendants say that the issues before the Court are the technical questions of whether they properly obtained the TSO-C148 approvals they say they have, and, assuming they did properly obtain the approvals, when did they obtain them.

The Court submits that, in addition to historical questions, there are also technical questions at issue here, as well as issues of regulatory consistency and uniformity, all of which the agency is best suited to answer first.

2.     To be sure, the issues before the Court were—at one point in time—simply the historical questions of whether MilSpec falsely advertised TSO-C148 approval for parts other than its C-SPEC 2600, 2700, and 4002 series and its C-SPEC Isolator Platemount Assembly.   To answer these questions, the only evidence the Court needed to consider was (1) the unchallenged September 9, 2003 and April 5, 2016 FAA letters that granted MilSpec TSO-C148 approvals for, respectively, the C-SPEC 2600, 2700, and 4002 parts (excluding, of course, the disputed "MS-O ( ) S Plush Flush—Extended Depth" parts) and the C-SPEC Isolator Platemount Assembly and (2) the list of parts that MilSpec advertises TSO-C148 approval for.   (Docs. 1 at ¶¶27–39; 39 at pp.11–12).   So, if this case had remained in stasis and all that the Court had to answer was whether MilSpec advertises (or advertised) TSO-C148 approvals not contained in the undisputed versions of the September 9, 2003 and April 5, 2016 FAA letters, then solely historical questions would still be before it.

But now, as this case has progressed, there is certainly a question here as to whether Defendants have forged purported FAA documents, submitted those documents to the FAA, and in doing so conned the FAA into granting TSO-C148 approvals—approvals that Defendants, perhaps, should not otherwise have.   Simply put, Plaintiff asserts that Defendants have committed fraud on the FAA in order to obtain TSO-C148 approvals.   (*See* Doc. 55 at ¶37) (noting the "clear

attempt on MILSPEC's part to create favorable evidence for its case, defraud this Court and the FAA"); (Doc. 55 at p.18) ("Defendants fabricated the December 23, 2009 document and the December 23, 2003 document; altered the September 9, 2003 document; and modified all of its drawings and M[aster ]D[rawing ]L[ists]'s before providing them to the FAA, Plaintiff and this Court claiming that such documents were originally sent to the FAA in 2009 when in fact they were not."). Such misrepresentations, and agency action they influenced, can be the basis of the Court's exercise of the primary jurisdiction doctrine, which could afford the agency an opportunity to consider and remedy the action. *See, e.g.*, *Cty. of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1387, 1396 (E.D.N.Y. 1989), *aff'd,* 907 F.2d 1295 (2d Cir. 1990) ("The doctrine of primary jurisdiction applies even where a central issue is whether misrepresentations to an administrative agency resulted in rate increases.").

And, here, Defendants' own evidence supports the assertion that they made misrepresentations to the FAA: Summers admits that he has submitted at least one altered document—on behalf of MilSpec and in support of MilSpec's recently obtained TSO-C148 March 30, 2017 approval letter—to the FAA.[23] In addition, if the Court adopts Plaintiff's position that Defendants have indeed forged the December 23, 2009 FAA letter, then it appears that Defendants have submitted that falsified letter to the FAA too. To explain, Defendants submitted a February

---

[23] (Doc. 62 at ¶13) ("When I produced documents to the FAA in March of this year, I mistakenly sent the September 9, 2003 letter I had altered with a reference to the extended depth grommets. I then attached the correspondence to the FAA (with attachments) to my previous affidavit. I had no idea that I had done that when I attested to the documents as being true and correct. I had no idea that I had done that when I attested that the attachments were not fabricated. I meant to send the FAA the original September 9, 2003 letter."). To be sure, Plaintiff's allegations that Defendants have committed fraud upon the Court are not taken lightly; especially given Summers' admission that he has submitted to the Court at least two altered documents. (Doc. 62 at ¶¶11, 15–16). But though the Court can competently determine whether MilSpec and Summers committed fraud in this proceeding, that determination would not be dispositive as to whether the FAA has properly granted MilSpec TSO-C148 approvals. *See* subsection III.B.3.

27, 2017 FAA document that states that "[a]n internal FAA audit of the FAA's Certification Project Notification database, Regulatory Guidance Library, and records archive revealed that the TSO applications and data your company submitted for the approval of the TSO-C148 fasteners (listed in Table 1, below) under FAA project number SP12050AT are missing from our records." (Doc. 39 at p.13). The Table listed in this FAA letter identifies numerous fasteners that are at issue here. (Doc. 39 at pp.13–15).

Then, from what the Court can garner from the record, it appears that based on this February 27, 2017 FAA letter MilSpec (through Summers) and the FAA (through its officials) exchanged various emails that reference "project number SP12050AT" and for which Summers provided the FAA with evidence that supported TSO-C148 approvals for MilSpec's C-LOCK, Z-LOCK, and A-LOCK parts. (*See generally* Doc. 39 at pp.13–72). Next, assumedly based on submissions from Summers to the FAA, the FAA granted MilSpec TSO-C148 approval for numerous C-LOCK, Z-LOCK, and A-LOCK parts in a March 30, 2017 letter. And that letter references "project number SP12050AT" and states the following: "*This is to correct TSOA letter, dated December 23, 2009,* which incorrectly referenced the production facility as Leesburg, FL, instead of Sorrento, FL. Please find the corrected letter below." (Doc. 39 at pp.16–18) (emphasis added).

It appears that this March 30, 2017 letter purports to correct—and perhaps relies on or even adopts—the very December 23, 2009 letter that Defendants base TSO-C148 approval of numerous A-LOCK, Z-LOCK, and C-LOCK parts on and the very letter that Plaintiff intensely insists is a fraud. Lastly, as an important aside, to the extent that the FAA has already considered the allegedly fraudulent December 23, 2009 letter and, more broadly MilSpec's TSO-C148 approvals in general, the FAA has already begun to address the issues before the Court. *See Functional*

*Pathways of Tennessee, LLC*, 2016 WL 6902363 at \*3 (noting that when the agency has already begun to review an issue before a court, the court runs the risk of creating "inconsistent rulings, potentially resulting in even more litigation" by attempting to resolve the issue itself).

3.      Notably, even if the Court found that all of the documents that Plaintiff alleges are fraudulent are so,[24] the Court cannot say whether the FAA, in its discretion, properly granted (or would have granted) MilSpec TSO-C148 approval in the March 30, 2017 letter—the Court does not know the universe of documents the FAA considered in issuing such approval on March 30, 2017 or what discretion it exercised.   And the parties have not helped the Court solve this quandary: though both parties have each submitted numerous affidavits to assist the Court in determining whether MilSpec has the TSO-C148 approvals at issue, (Docs. 33, 34, 39, 40, 41, 42, 62, 63, 64, 65), there is no testimony or affidavit before the Court from the FAA officials assigned to MilSpec's TSO-C148 applications.   Only the FAA knows the basis for its most recent March 30, 2017 TSO-C148 approval granted to MilSpec—the Court can only speculate about the FAA's grounds for that approbation.

And whether MilSpec *should* have TSO-C148 approvals is surely a technical question for the FAA to decide in its judgment and discretion.   *Takacs*, 546 F. Supp. at 78, 79 (noting that TSO approval involves both policy and discretionary FAA judgments).   It is a question that the agency should answer.   *Gamble*, 511 F. Supp. 2d at 1126 (noting that the primary jurisdiction doctrine applies to discretionary, technical matters that the court can resolve only through guesswork).

If Defendants have fraudulently obtained FAA TSO-C148 approval and sell (or have sold) aircraft fasteners under this false guise, then the FAA (not this Court) is the appropriate body to

---

[24] Namely, the allegedly altered September 9, 2003 letter, the purportedly forged December 23, 2003 (or 2008) letter, the purportedly forged December 23, 2009 letters (both the "Sorrento" and the "Leesburg" versions), and the allegedly improperly modified CAD drawings and Master Drawing Lists.

take whatever regulatory actions it deems necessary, in the first instance, to promote the safety of all aircraft flying with those parts. The FAA is in the position to revoke any TSO approvals that MilSpec may have, 14 C.F.R. § 21.2(b)(1–2), and then—in its discretion—administer a uniform solution notifying all parties who may possess unapproved MilSpec fasteners. Certainly, the FAA, as the SUP Program reveals, has numerous mechanisms to ensure that parts that do not meet FAA regulatory requirements are addressed. *See, e.g.*, FAA Order 8120.16A at 4-4. Further, it is clear that Plaintiff believes that the sale of unapproved fasteners is a safety concern to the public, (Doc. 1 at ¶36; 32 at p.3, 23) ("In the instant case, the evidence shows that Defendants are selling A-SPEC and Z-SPEC parts that are unapproved by the FAA and some C-SPEC parts that are also unapproved which is putting anyone that flies in an airplane with a MILSPEC part installed in immediate danger, which is an important public safety concern.") and that Plaintiff asks this Court to force Defendants to notify their customers about the alleged unapproved parts, (Doc. 32 at pp.24, 25; 32-15 at ¶¶H–J).

The Court therefore finds that "the interests of uniformity and consistency in the aviation field would be promoted by the FAA's resolution of these issues." *Commander Properties Corp. v. Beech Aircraft Corp.*, 745 F. Supp. 650, 652 & n.1 (D. Kan. 1990) (referring a case to the FAA when the plaintiff asserted that the defendant's wing design was defective and not "airworthy"). Whether MilSpec has TSO-C148 approvals and, if so, whether the FAA properly granted those TSO-C148 approvals are technical issues best left to the agency that is alleged to have been defrauded, the agency with authority to enforce its regulations and to do so uniformly. Indeed, it

is the agency that, in the first instance, can best determine the fraud committed against it, if any, and take the necessary corrective action.[25]

## IV.   REFERRAL

Due to the seriousness of Plaintiff's fraud allegations, and the potential that unapproved fasteners and other parts may have entered the aviation marketplace, the Court finds that directing Plaintiff to file a Formal Complaint under 14 C.F.R. § 13.5 with the FAA is appropriate. *See Commander Properties Corp.*, 745 F. Supp. at 652.   This method of referral will allow Plaintiff, Defendants, and the Court to provide the FAA with a complete evidentiary record of this case and obtain a sufficient resolution of the factual issues at hand.[26]

Under 14 C.F.R. § 13.5(a), the FAA regulations allow for the filing of a Formal Complaint—"Any person may file a complaint with the Administrator with respect to anything done or omitted to be done by any person in contravention of any provision of any Act or of any regulation or order issued under it, as to matters within the jurisdiction of the Administrator." Formal Complaints filed under § 13.5 must meet certain strictures, which include the following:

[A Formal Complaint] must—
(1) Be submitted in writing and identified as a complaint filed for the purpose of seeking an appropriate order or other enforcement action;

---

[25] Also before the Court is Plaintiff's motion for sanctions, to which Defendants responded, and Plaintiff replied.   (Docs. 55, 56, 61, 62, 63, 64, 65, 69).   But inherent in the agency's consideration of what approvals the Defendants do or do not have will be an assessment of whether documents submitted to it are fraudulent or otherwise misleading.   To avoid an inconsistent ruling between this Court's consideration of the matter and the agency's, the Court will defer any ruling on Plaintiff's request for sanctions and terminate it without prejudice so Plaintiff may seek that relief again in light of the agency's findings.   Having the benefit of the agency's findings will also help the Court better fashion a sanction, if appropriate.

[26] Though Plaintiff opposes referral (and notes the potential length of time the Formal Complaint process may take), referral through 14 C.F.R. § 13.5 is Plaintiff's proposed method.   (Doc. 57 at pp.8–9). Defendants, both of whom request referral, do not offer an opinion on how the case should be referred. (Doc. 59).

(2) Be submitted to the Federal Aviation Administration, Office of the Chief Counsel, Attention: Enforcement Docket (AGC–10), 800 Independence Avenue, S.W., Washington, DC 20591;

(3) Set forth the name and address, if known, of each person who is the subject of the complaint and, with respect to each person, the specific provisions of the Act or regulation or order that the complainant believes were violated;

(4) Contain a concise but complete statement of the facts relied upon to substantiate each allegation;

(5) State the name, address and telephone number of the person filing the complaint; and

(6) Be signed by the person filing the complaint or a duly authorized representative.

14 C.F.R. § 13.5(b). A properly submitted Formal Complaint "will be docketed and a copy mailed to each person named in the complaint" and "[t]he person named in the complaint shall file an answer within 20 days after service of a copy of the complaint."[27]   14 C.F.R. § 13.5(d), (f).

Once a Formal Complaint "has been answered or after the allotted time in which to file an answer has expired, the [FAA] Administrator shall determine if there are reasonable grounds for investigating the complaint," and, if such grounds do exist, "an informal investigation may be initiated or an order of investigation may be issued in accordance with subpart F of this part, or both."   14 C.F.R. § 13.5(g),(i).   "If the investigation substantiates the allegations set forth in the complaint, a notice of proposed order may be issued or other enforcement action taken in accordance with [the FAA's investigative and enforcements procedures]."   14 C.F.R. § 13.5(j).

---

[27] "The complaint and other pleadings and official FAA records relating to the disposition of the complaint are maintained in current docket form in the Enforcement Docket (AGC–10), Office of the Chief Counsel, Federal Aviation Administration, 800 Independence Avenue, S. W., Washington, D. C. 20591." 14 C.F.R. § 13.5(k).   Further, "[a]ny interested person may examine any docketed material at that office, at any time after the docket is established, except material that is ordered withheld from the public under applicable law or regulations, and may obtain a photostatic or duplicate copy upon paying the cost of the copy."   *Id.*

## V.     CONCLUSION

Accordingly, and upon due consideration, it is **ORDERED** as follows:

1.  Skybolt Aeromotive Corporation **SHALL FILE**, consistent with the requirements of 14 C.F.R. § 13.5, a Formal Complaint against MilSpec Products, Inc., with the Federal Aviation Administration.

2.  The Clerk is **DIRECTED** to send a copy of this Order, the Complaint (Doc. 1), and each document referenced herein (Docs. 32, 33, 34, 38, 39, 40, 41, 42, 49, 55, 56, 57, 59, 61, 62, 63, 64, 65, 69), along with any attachments, to the Federal Aviation Administration, Office of the Chief Counsel, 800 Independence Avenue, S.W., Washington, D.C. 20591.

3.  MilSpec Products, Inc., **SHALL**—as it has already promised to do, (*see* Doc. 61 at p.12)—preserve any and all hard drives and other electronic storage medium (or copies thereof) with information relevant to this case.

4.  The Clerk is **DIRECTED** to administratively close this case and **TERMINATE** all pending motions as moot.

5.  Once the Federal Aviation Administration has taken final action, Skybolt Aeromotive Corporation **SHALL**, within fourteen days of that action, file a motion asking the Court to reopen this case (a notice will be insufficient to reopen the case).

6.  The parties **SHALL FILE**, jointly or separately, a status update with the Court every three months hereafter.

7. The Federal Aviation Administration is invited to share with the Court its findings and decision.

**DONE** and **ORDERED** in Ocala, Florida on June 9, 2017.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties